LUIS POLO FORASTIERI, Plaintiff and Appellant, *v.* WHITE STAR BUS LINE, INC., Defendant and Appellee.

No. 7520. Argued April 26, 1938.—Decided February 9, 1939.

230

*F. Prieto Azuar,* for appellant. *Celestino Iriarte, F. Fernández Cuyar* and *H. González Blanes,* for appellee.

Mr. Justice Hutchison delivered the opinion of the Court.

Defendant, in an action for personal injuries alleged to have been caused by the negligent operation of one of its autobuses, after certain denials, set up by way of affirmative defense the following:

"Defendant alleges that if at the place, date or hour at which it is claimed these events occurred, any accident happened by virtue of which Luis Polo Forastieri suffered some injury, said accident if any was due solely and exclusively to plaintiff's negligence, reck-

lessness and carelessness, without any concurring negligence on defendant's part.

"Defendant likewise alleges that if at the place, date or hour at which it is claimed these events occurred, any accident happened by virtue of which Luis Polo Forastieri suffered some injury, and assuming that there was negligence on defendant's part, the proximate cause of said accident, if any, was solely and exclusively owing to plaintiff's contributory negligence."

At the trial defendant was permitted to introduce evidence tending to show that the injuries received by plaintiff were the result of an unavoidable accident. This is assigned as error.

We quite agree with the district judge that, as a general rule, the defendant may, under a general denial of alleged negligence, rely on the theory of an unavoidable accident. Our only doubt has been as to whether, in view of the specific denials now before us (omitted here in the interest of brevity) and of the affirmative defenses indicated in the preceding paragraph, the rule should be followed in the instant case. A careful examination of all the evidence has convinced us, however, that plaintiff was not misled by defendant's pleading nor, in fact, taken by surprise at the trial by defendant's evidence concerning the alleged unavoidable character of the accident. In any event, if after an examination of all the evidence, we should come to the conclusion that defendant's negligence was a substantial factor in bringing about plaintiff's injury, then the error, if any, in admitting the evidence, introduced in support of defendant's theory of the so-called unavoidable accident, may be regarded as harmless.

Polo, an insular policeman, while off duty during the noon rush hour, boarded one of defendant's buses on Ponce de León Avenue at Stop 15. There was testimony tending to show that the bus was crowded and that passengers were standing in the aisle. In any event, Polo remained standing on the front platform or on the step. At stop 16, the driver of the bus brought it to a sudden stop in order to avoid injury to a child who was attempting to cross or

apparently was about to cross the avenue. Polo was thrown from the step and injured. There was testimony tending to show that immediately before the accident, the bus was travelling at a higher rate of speed than that prescribed by law for the urban zone of a municipality. The district judge found that Polo was guilty of contributory negligence and in support of his finding cited *Hubbard* v. *Bartholomew,* 144 N. W. 13, as holding that:

"A policeman off duty and riding as a guest in another's automobile, when injured in a collision, was guilty of contributory negligence in remaining silent and permitting the automobile driver to drive at an unlawful speed, and hence could not recover for his injury."

Section 18 of "An Act to regulate the operation of motor vehicles in Puerto Rico, and for other purposes", approved April 13, 1916 (Session Laws 140, 147, 148) makes the violation of the provisions of that Act a misdemeanor. Sections 12 (*a*) and 13 (*a*) read as follows:

"Section 12(*a*).—That persons operating motor vehicles on the public highway shall at all times exercise due care and take every reasonable precaution to insure the safety of persons and property.

"Section 13.—(*a*) The speed of motor vehicles shall at all times be regulated with due care and with due regard to the width, amount of traffic and use of the highway, but the driving at any time of any motor vehicle on the public highway at any rate of speed faster than forty-eight kilometers an hour, or within the urban zone of a municipality faster than twenty-four kilometers per hour, shall be *prima facie* evidence that it was being driven without due care."

The offense defined by section 13 (*a*) is reckless driving. The latter portion of subdivision (*a*) merely establishes a rule of evidence. It does not forbid driving at more than forty-eight kilometers per hour on any highway or at more than twenty-four kilometers per hour in the urban zone of any municipality. The operation of a motor vehicle at more than forty-eight kilometers per hour on any public highway

or at more than twenty-four kilometers per hour in the urban zone of a municipality, may or may not be an offense according to circumstances. Due care and due regard to traffic conditions and to the width and use of the highway are the determining factors in every case. Driving at more than forty-eight kilometers an hour on any public highway or at more than twenty-four kilometers per hour in the urban zone of any municipality is at most, merely that the statute declares it to be, namely *prima facie* evidence that the vehicle was being driven without due care. Where there is any other evidence in the case bearing upon the question of due care, the rate of speed becomes one of a number of circumstances to be taken into consideration in passing upon the question of negligence. If, in the instant case, the attendant circumstances were such as to indicate that the rate of speed after leaving stop 15 and before arriving at a point within the immediate vicinity of stop 16 involved no risk to passengers in the autobus nor to other users of the highway and if Polo had no reason to believe that the speed of the vehicle would not be reduced before arriving at stop 16, it was not incumbent on him, either as a policeman or as a passenger, to inform the driver that he was moving at more than twenty-four kilometers per hour. In any event if Polo, after becoming aware of the fact that the bus was travelling at more than twenty-four kilometers per hour, had no reasonable time and opportunity for communication with the driver, his failure to warn the driver would not be a bar to recovery.

Ramón Acevedo, first witness for plaintiff, was standing at stop 16, corner of Ponce de León Avenue and San Juan Street. The bus, he said, did not come at once to a full stop; there were three jolts. Many vehicles were passing. The avenue was wide. On cross examination he said: the application of the brakes was what drew his attention to the bus; he saw the bus before the brakes were applied; the bus approached rapidly; he was not looking at the bus as it came near but when the brakes were applied he noticed

the rate of speed; he did not see it before the brakes were applied. The bus came to a stop on the right hand side of the road alongside the streetcar track. When the brakes were applied and witness turned his head, the policeman was still inside the bus. After witness heard the brakes, the policeman fell toward the inside and then fell out backwards. Witness turned his head and saw the bus for the first time when he heard it skid. When witness first saw the bus it was travelling downhill; from that time and after skidding, it travelled about 65 feet. It came to a stop below the corner of San Juan Street. The brakes were applied opposite the point where witness stood and the bus came to a stop in front of the five and ten cent store, the width of San Juan Street. San Juan Street is wide enough to accommodate two automobiles. The application of the brakes was violent, very violent. There was a good deal of traffic moving in the direction of Santurce and a number of buses. During about two minutes the bus that caused the accident was the only one that passed. Others passed after the accident. For two or three minutes before the accident, no other bus had passed, nor any automobile. Witness did not remember about the automobiles.

Pablo Cuebas, a government road overseer, was waiting for a bus. It stopped suddenly, he said, at high speed. The policeman came out and fell to the ground. He fell through the entrance doorway to the right of the bus. He fell to the roadway, turned and fell over the track, over the ties. He came out through the entrance doorway, from inside the bus. He fell backward in a sitting posture. At that point the roadway had a slight down grade. The bus was going down hill. Was going pretty fast. The bus came to a stop some two meters below where the policeman fell. It stopped violently in a moment. It was coming pretty fast. The avenue is of regular width. There is room for some three cars, is twelve meters wide. It is one of the widest highways. It is pretty well travelled. On that day there was

much traffic. The buses were full. It was about twelve o'clock or five minutes past twelve. Witness was standing at the stop, where the buses stop. The stop was not marked but the buses always stop there. There were other buses before and behind the bus, a line of traffic. The bus was one of that line. In that line they were running very fast. The automobiles were also running fast. Witness was not a chauffeur. He could tell more or less whether or not a car was travelling slowly or very fast. They were all moving at a high rate of speed. Witness could not remember whether other vehicles were moving ahead of the bus. There were some Río Piedras buses behind it. There was another bus some ten or fourteen meters behind it. This second bus did not collide with the one which caused the accident. The other buses applied their brakes but there was no collision. The bus stopped about ten meters beyond San Juan Street and about two meters beyond where the policeman fell. On cross-examination witness said he saw the bus at a distance of fifteen or twenty meters before it reached the spot where he was standing. The distance between the place where the bus was when witness first saw it and the place where it was when the brakes were first applied as about twenty meters. The stop on the highay is before reaching the street intersection. Witness heard the sound of the brakes and looked to see what it was; he was looking toward San Juan and the bus had passed him when he heard the brakes. The bus had passed about one meter beyond witness when he heard the brakes. He was looking toward San Juan and when he heard the brakes he looked in the other direction. He heard the noise. The bus did not stop rapidly. It did not stop when the brakes were first applied but on the second application. The accident occurred after the bus had passed the place where witness was standing, looking toward San Juan. When witness heard the noise he was looking toward San Juan awaiting the bus which he was going to take. He heard the noise of the brakes, turned and saw the police-

man fall backward. The bus was full of passengers, in the seats, in the aisles and in all parts. The policeman was standing. Witness saw him when he fell out. When witness heard the brakes, he looked toward Río Piedras. When witness heard the brakes, Polo came out from inside the bus.

Aurelio Muñiz Cintrón was on the second seat to the left from the front, that is to say, on the right hand side of the bus facing the front. Some ten passengers were standing. Polo was standing in front holding the rod to which the fare box was attached about one and one-half meters from witness. The speed of the bus on arrival at stop 16½ was, in the opinion of witness, abnormal, about thirty-five miles an hour. There was a down grade from stop 15. It was one of the most travelled sections of Santurce. Witness knew how to drive a car, an experience of seven years with four different makes. He almost lived in the buses. The driver applied the brakes but because of the speed could not stop at once but "dragged" and then again applied the brakes. His action was "brusque". At the first jerk, all, including the policeman, were thrown forward. At the second application of the brakes, the policeman lost his hold and went outside and fell backward to the pavement. The highway there was narrow and much travelled. There was hardly room for more than three or four vehicles. Witness had seen many accidents at that place. During the rush hour the buses always carry standing passengers.

On cross-examination: Polo was standing holding the rod with his left hand. The bus stopped and all were thrown forward. When the brakes were first applied, Polo was thrown forward. The bus continued to move and the brakes were again applied. Polo lost his hold and was thrown from the bus. At the second application of the brakes, he turned "thus", with the jerk of the bus he did "thus" and turned toward the rear. Then the brakes were again applied. The expulsion was violent. Polo lost his hold and fell backward to the pavement. The brakes were applied three times

within a few seconds. When going fast it is impossible to stop on the first application of the brakes. The manner in which Polo was shot out of the bus was instantaneous. He was here one moment and the next moment on the ground. Witness saw him go forward at the second application of the brakes. Then he turned toward the outside. At the second application of the brakes, he was thrown entirely clear of the bus. There were several cars ahead of the bus. Witness did not know whether there were any cars behind. The bus was not passing any other vehicle. Witness did not remember the automobiles that were ahead of the bus.

Epifania Serrano testified that the bus was going pretty fast. It stopped at 16. Witness saw plaintiff in the bus. He was standing in the middle near the front with one hand on the rod of the bus and the other on the rod which supports the fare box. He had a coat on his arm. When the brakes were applied the bus gave several jerks and he went toward the front. He received a blow on the forehead and then fell backward into the highway. Witness was on the third seat on the right hand side of the bus next to the window. The bus was going pretty fast, very fast. The brakes were applied with such force that it took three jumps. It was when the brakes were applied that Polo was thrown forward and then fell backward to the ground. On the day of the accident there was much traffic before and behind the bus. The bus passed stop 16 and stopped beyond San Juan Street. The bus was going pretty fast, very fast and when the brakes were applied gave three hard jolts. Polo was standing and, being so tall, was in a half stooping position. One hand on the rod and the other on the fare box and as the jolts were so hard, he was thrown forward and struck his forehead. Witness then saw him when he fell backward to the ground, and the streetcar track. The stop was violent, very violent. The passengers were thrown forward. The bus was completely full. The passengers were not thrown out through the door nor thrown from their seats.

Those who were standing besides Polo were thrown forward but did not fall. Polo, who was holding the rods, was the only one who fell. He was the only one at the fare box. He was standing before the front window. The others were standing behind him. Witness was on the right hand side of her seat. Polo was standing in front of the window on the right hand side of the bus.

Juan Torres Vega, a chauffeur with twelve years of experience, testified that he was standing in front of the five and ten cent store at stop 16 and gave the bus a stop signal. He estimated the speed of the bus at thirty miles an hour. The driver applied the brakes and the bus came to a sudden stop. The policeman was thrown out through the door. It was a violent application of the brakes. It was a "brusque" stop. Polo fell backward. He came out from inside the front part of the bus. He fell face downward. He was face downward. He had already fallen and tried to get up, he fell backward. On cross-examination the witness said that, at the time of the accident, he was employed by the White Star Line as a supernumerary. At the time of the trial, witness had not worked for the White Star Line for some two years or two years and a half. About a month after the accident, he had left the company, he had ceased to work with the White Star Line because of a quarrel with Mr. Arcelay. Witness was not sent to jail because of that quarrel. It was a personal quarrel. Witness did not threaten Mr. Arcelay with a revolver. It was Arcelay's own fear which prompted him to send for Chief Lloréns. Witness lived on the highway and as he had to be there, Arcelay imagined that witness was waylaying him, then witness was surprised by two policemen on the highway and taken to the police station where Chief Lloréns told him that he should not kill Arcelay; that Arcelay was a good man. Then witness told Lloréns that such a thought had never occurred to him. Witness resigned of his own volition, his badge was not taken from him. He was not discharged. He had

a quarrel with Arcelay who suspended him for two months and he turned in his badge before the time was up.

Polo himself testified that he was holding a rod at the entrance with his right hand and the fare box with his left hand stooping a little because the top was somewhat low and bothered him. Witness was five feet, ten inches in height. He carried a coat in his hand. ''The bus was running freely as it had its full number of passengers''. The driver, on passing San Juan Street near the five and ten cent store, brought the bus to a sudden stop and applied the brakes with such force that all the passengers were thrown toward the front and witness, being the first, struck the frame above the window and was stunned (*atontado*), left the platform and, trying to steady himself stepped into the space above the step, fell to one side and when the brakes were again applied, was thrown backward. When witness tried to steady himself, he had lost his hold. He fell backward and as the body of the bus was low, witness was caught and dragged by it. The application of the brakes was a surprise, violent. On cross-examination witness explained that by the phrase ''running freely'', he meant that the bus had no intention of stopping at the regular stop. It had passed the stop. It had not reduced the speed as the others do in order to stop before reaching the street intersection. It was travelling at about thirty-five miles, witness noticed that. Asked why he did not call the driver's attention to the rate of speed, witness answered that sometimes when their attention is called to such matters, they say that they are the government. Asked by the judge if witness had filed complaints against the White Star drivers, he answered in the affirmative. Asked concerning the result, he answered that they had never been convicted. Asked by defendant if, when the drivers said they were the government, witness permitted them to violate the law and to do what they pleased, he answered that on one occasion one of them had disobeyed him about lights saying that he had his representative, that

*"para eso somos gobierno". "Ser chauffeur de la White Star es ser gobierno."* Asked whether witness had not called the driver's attention to the fact that he was violating the law, witness answered in the negative. Asked whether witness was not aware that the driver was violating the law and acting negligently, he answered: "Well, not negligently, because he was driving properly." The bus was going fast, but the driver knew what he was doing. He was in a normal condition. The speed limit, witness added, was twenty-four miles. The bus, he said, had no speedometer. Asked by the judge how witness knew that the bus was travelling at thirty-five miles an hour, he answered that he had followed them on a motorcycle and has followed automobiles and checked their speed, and by practice". "Those buses", witness added, "are very fast." Asked by defendant whether witness knew that the bus was driven at more than twenty-four kilometers per hour, he answered: "That is true". Witness did not draw the driver's attention to the matter at any time. He did not consider that there was any danger because he knew that they were careful to avoid collision. Asked if he did not consider such speed dangerous, witness answered in the affirmative, but explained that the driver's attention could not be called to the matter for certain reasons. "That no policeman does it". Asked about the motorcycles, witness answered: "That is for the nickelers" *(velloneros)*.

For the purpose of this opinion it may be conceded that a policeman while riding on a bus, whether on or off duty, has a somewhat greater responsibility than that of the ordinary passenger in dealing with a reckless driver. Some room for such a differentiation may be found in the fact that a word of caution from a police officer might be more effective than it would be if given by another. In either case, however, there must be some obvious danger or some negligence on the part of the driver; otherwise there is no occasion for unsought advice, and it is not incumbent upon a policeman or upon any other passenger to offer any sug-

gestion. Whatever the duty of a policeman may be, his duty as a passenger—barring the possibility of some such distinction as that just indicated—is the same as that of any other passenger. All the law requires of any passenger is the exercise of ordinary care for his own safety. Even an experienced motorist is not required to keep his eye on the speedometer. He need not be alert to discover unseen and unsuspected danger. He may, without laying himself open to the charge of contributory negligence—unless the danger be obvious, unless the driver be under the influence of liquor or for some other reason in an abnormal condition, or manifestly incompetent, reckless or negligent—relax and leave the operation and management of the vehicle to the driver, turn in his seat and converse with other passengers, read a book or a newspaper or close his eyes and go to sleep. There is no reason why any greater degree of care should be demanded of a policeman merely because he is a policeman.

In the instant case there is nothing to show how far the bus travelled between stops 15 and 16. There is nothing to show at what point between these two stops the bus developed a speed of more than twenty-four kilometers an hour. There is nothing to show that the bus was travelling at more than twenty-four kilometers per hour before its arrival at a point within the immediate vicinity of stop 16. Even otherwise, there would be nothing beyond the rate of speed itself, to show that such a rate of speed was hazardous before arrival at a point near stop 16. There is nothing to show that there were any cross-streets or street intersections between stops 15 and 16. It does appear that the bus was travelling along the right hand side of the avenue with the greater portion of the width of the avenue on its left and the street car track on its right between its own line of travel and the outer edge of the avenue. The bus was one in a line of motor vehicles, all moving in the same direction and apparently at more or less the same rate of speed. These attend-

ant circumstances, without more, were more than enough to offset and to overcome the statutory presumption that the rate of speed—if in fact more than twenty-four kilometers per hour—was before arrival at a point near stop 16, reckless or negligent. If Polo, before arriving at a point near stop 16, became aware of the fact (if it was a fact) that the bus was moving at more than twenty-four kilometers per hour, he was quite right in his conclusion that the high rate of speed was not negligent. There is nothing to show that he had any reasonable time or opportunity to caution the driver before the accident and after it became apparent that the driver did not intend to stop at stop 16, or to reduce the speed before passing that point. We find no satisfactory basis for the conclusion reached by the district judge that Polo was guilty of contributory negligence.

The fact, if it be a fact, that Polo was standing with one foot on the floor of the front platform and the other foot on an inside step below the level of the floor, does not seem to have impressed the district judge. He does not discuss it as bearing on the question of contributory negligence. In any event, it did not amount to contributory negligence.

The testimony for plaintiff tended to show that the bus stopped at a signal from Juan Torres Vega already mentioned as a witness for plaintiff. The testimony for defendant tended to show that the bus driver applied the brakes in order to avoid injury to a school girl who was about to cross or attempting to cross the highway. . As to this aspect of the case, the district judge definitely discarded plaintiff's theory and adopted that of defendant. The judge also found that the sudden stop caused Polo to fall from the platform of the bus. He did not discuss the question of defendant's negligence in operating the bus at a speed of more than twenty-four kilometers an hour as a proximate cause of the accident, nor did he discuss the attempt of the girl to cross the highway as an intervening cause. His only specific finding (aside from the question of damages) was that Polo had

been guilty of contributory negligence in not calling the driver's attention to the fact that he was exceeding the speed limit. This finding disposed of defendant's contention that the bus was travelling at less than twenty-four kilometers per hour immediately before the accident. Hence, we have not deemed it necessary to discuss the evidence adduced by defendant in support of that contention.

This is not the case of a child who was not in sight or who gave no sign of an intention to cross a city street before suddenly running in front of an automobile moving at a permissible rate of speed between crossings as in *Aguayo* v. *Municipality of San Juan*, 35 P.R.R. 390. This is not the case of a pedestrian who, while walking along the sidewalk midway between street crossings, suddenly steps from the sidewalk immediately in front of a passing car, the driver of which had no reason to anticipate such action. See *People* v. *Castillo*, 45 P.R.R. ——. It is not the case of a pedestrian who steps out from in front of a parked car into the path of a passing automobile driven at a moderate speed. De *García* v. *Figueroa & Gauthier*, 52 P.R.R.——. A reading of the opinion in *Meléndez* v. *Alvarez*, 35 P.R.R. 316, will suffice to distinguish that case.

Eloy Rodríguez, a passenger on the bus, testified as a witness for defendant that there was a street intersection before reaching the Santurce Clinic "and from there a little girl came out". Witness had a good view of her. Asked on which side of the road going from San Juan to Santurce the child was, witness answered: "Before reaching the clinic, from the car track to the street. *Cruzó la guagua.*" When witness first saw the child, she was about fifty feet from the bus. Before she crossed, the driver applied the brakes. She was about fifty feet from the bus when she began to cross. She crossed almost at right angles, from the track to the highway. Asked whether she was running or walking, witness answered: "Running". Asked what the chauffeur did when the child started to run in front of the bus,

witness answered: "He applied the brakes and the bus stopped at once. Miraculously nothing happened to the child".

Carlos Matías, another passenger on the bus, testified that the accident occurred a little beyond stop 16. Witness knew the five-and-ten cent store there. It was near the Santurce Clinic. At the moment of the accident a little girl crossed the street and the driver applied the brakes. Asked whether she crossed walking or running, witness answered that she crossed quickly. A girl crossed and the chauffeur was obliged to apply the brakes forcibly. The bus had stopped at stop 16 and the accident was beyond that stop. Asked whether the bus was near or far when the child started to run, witness answered: "It was near, the child crossed in front of it; there was traffic both ways, and the chauffeur stopped." The child was nine or ten years old. There was a wide sidewalk there at the Santurce Clinic and there was a store.

Luisa Freyre, another passenger, testified that a man in the bus cried "He killed her", and witness saw a little girl run. Then the brakes were applied and Polo fell. Witness saw the child while the bus was in motion and she was like this (indicating with the hand). The child was seven or eight years old. She crossed from right to left. She came from the Santurce Clinic sidewalk toward the front. She came from thereabouts (*salía de por allí*) because that is where the accident occurred, in front of the clinic. Witness, when asked how she, from her seat on the left behind the chauffeur, could see the girl cross from right to left, answered that when witness saw the girl, she "passed the sidewalk", it was when she heard the cry "they killed her". Asked again how witness, from her seat, could see the child cross, witness answered that she saw her perfectly, notwithstanding the fact that there were two seats accommodating four passengers, and the chauffeur ahead of her, and the fare-

box and Polo standing on the step; that witness saw her because witness was inside and. there was a little window.

Emilio Martínez, the bus driver, testified: that he was employed by the White Star Line as a chauffeur; that he had been working. as a chauffeur for ten years; that on arriving at stop 16½ there was a school girl in uniform with her books, standing on the track, and witness saw her make a gesture as if she was going to cross the street and reduced his speed a little; then witness saw her start and applied the brakes forcibly. Asked if the application of the brakes was because the girl came running on the street, witness answered: "Yes, sir, when the girl started running to cross the street, the bus was near her." She was a school girl about nine years old; in front there was a store. There was San Juan Street. There was no policeman. The accident was at the San Juan Street entrance. San Juan Street is two or three houses this. side of the Santurce Clinic.

Defendant's bus, immediately before the accident, was arriving at a regular stop at a street intersection—a point which pedestrians who desire to cross the avenue during the rush hours would naturally select as less dangerous than elsewhere, as for instance, between stops or between street intersections. There is nothing in the evidence to indicate that the view of the bus driver was obstructed. Even if his view had been obstructed, that fact should have prompted him to reduce his speed before reaching the stop or before attempting to pass a place where pedestrians might be encountered in the act of crossing the highway. He was no novice in the handling of motor vehicles. He needed no one to inform him as to the speed at which he was travelling. He knew that he was going down grade in a somewhat heavy vehicle, rather heavily loaded. He knew that Polo was standing beside him on the front platform, or with one foot on the floor of the platform and the other foot on the step. There was at least one prospective passenger, Pablo Cuebas, on the near side of San Juan Street who saw the bus fifteen

or twenty meters before it passed the spot where he stood. The accident occurred at or beyond the far side of San Juan Street, after the bus had passed the place where Cuebas was standing. If the girl, when first seen by the bus driver, was standing on the street-car track, it should have been apparent to the bus driver that she was probably awaiting an opportunity to cross the avenue or might attempt to cross at her first opportunity, even before she made any "gesture as if she were going to cross the street". Obviously she was not awaiting a bus or a street-car at the place where she stood. On the other hand, if the girl had left the sidewalk and was moving toward the avenue, as indicated by the testimony of Luisa Freyre and by that of Eloy Rodríguez, supra, it should have been equally apparent to the bus driver that she intended to cross the avenue. The bus driver's statement in response to a leading question by counsel for defendant that the brakes were applied "when the girl started running to cross the street"—viewed in the light of his testimony up to that point—is not very persuasive. We find nothing in the situation at and in the immediate vicinity of the San Juan Street intersection to offset the fact as found by the district judge that the bus was traveling at more than twenty-four kilometers per hour, a fact which by express statutory provision is made *prima facie* evidence of negligence.

With the exception of one or two questions concerning the seat occupied by the witness—Luisa Freyre—and the possible obstruction of her line of vision, counsel for plaintiff —under the impression that cross-examination of defendant's witnesses might be inconsistent with objections to the admissibility of all testimony tending to show that the accident was unavoidable—abstained from such cross—examination. The same witnesses who testified to the manner in which the girl attempted to cross the avenue, also testified that the bus was travelling at ten or fifteen miles an hour. The district judge rejected this part of their testimony and accepted as

true the testimony of witnesses for plaintiff, several of whom said the bus was travelling at about thirty-five miles an hour. These same witnesses testified that three forcible applications of the brakes were required in order to bring the bus to a full stop. The manner in which Polo was catapulted from his position on the front platform, tends strongly to corroborate the testimony of these witnesses, both as to the speed at which the bus was travelling, and as to the manner in which it was brought to a standstill. The bus driver himself admits that he first reduced his speed when the girl made a gesture as if to cross the highway and applied the brakes presumably a second time, when she started to run, or ran in front of the bus. It is a fair inference from this testimony that he saw the girl either standing on the street railway track, beyond and across San Juan Street from the bus stop, before he arrived at and passed the bus stop, or at least before she made her first gesture indicating her intention to cross the avenue. If he was travelling at a much greater speed than fifteen miles per hour and if he did not reduce that speed up to the moment when the girl, according to this testimony and that of other witnesses for the defendant, ran in front of the bus, his negligence was continuous and continued to operate as a concurrent, proximate, efficient cause of the accident. But for his negligence the accident would not have occurred; or, at least, by the exercise of due care, the result would probably have been essentially mitigated.

It would seem superfluous to add that this is not an action brought by another user of the highway or by an invited guest to recover damages from the owner or operator of a motor vehicle not engaged in the transportation of passengers for hire. This is an action brought by a passenger against a common carrier. A bus driver is required to exercise more than ordinary care for the safety of his passengers. The question as to whether or not the operator or owner of a motor vehicle, not engaged in the transporta-

tion of passengers for hire, would be liable for injuries suffered by an invited guest or by another user of the highway in the same or similar circumstances is not before us. Hence, it need not be decided now.

In the Restatement of the Law of Torts, Vol. 2, at page 1161, section 432, we find the following:

"Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if it would have been sustained even if the actor had not been negligent.

"(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be held by the jury to be a substantial factor in bringing it about."

Section 439 reads as follows:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

See also 45 Corpus Juris 939, 940, Section 499, and *Cruz v. Frau*, 31 P.R.R. 87.

The judgment of the district court must be reversed and, in lieu thereof, the judgment of this Court will be entered for plaintiff in the sum of $1,020, with costs, but excluding attorney's fees.

Mr. Justice Wolf dissented.

Mr. Justice De Jesús took no part in the decision of this case.